

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

### NO. PD-0644-10

### TOMMY CORONADO, Appellant

### v.

### THE STATE OF TEXAS

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW FROM THE SEVENTH COURT OF APPEALS DEAF SMITH COUNTY

**KELLER, P.J., filed a dissenting opinion.**

The Court holds that Article 38.071, Section 2, violates the Constitution. Unlike the Court, I think that there are rare occasions when the method of confrontation provided by the statute will be sufficient to satisfy the Constitution. In this case, unusual circumstances combine to render the method satisfactory, at least under current Supreme Court cases.

## I. BACKGROUND

But first, I take issue with the Court's rendition of the facts. The Court fails to appreciate the significance of two important facts: (1) expert testimony that the child would suffer trauma and be

unable to testify at trial or in a closed-circuit setting, and (2) defense counsel's decision to delegate follow-up questions to the forensic interviewer. These two facts are crucial to my conclusion that the interrogatories procedure in this unusual case did not violate the Confrontation Clause.

## A. The Expert's Testimony

The Court leaves out much of the testimony from expert witness Priscilla Kleinpeter regarding R.D.'s ability to testify at trial and in a closed-circuit setting and the likely trauma that she would suffer if the parties attempted to procure her testimony in one of those settings. Kleinpeter testified that she was a licensed marriage and family therapist and a licensed sex-offender-treatment provider. She had been employed for a little over a year by R.D.'s mother to provide therapy for R.D. Upon initial contact with the three-year-old child, Kleinpeter diagnosed the child as being a victim of sexual abuse and having post-traumatic stress disorder. R.D. was depressed, anxious, hypervigilant, emotional, and very clingy. R.D. talked about being afraid to be in a room alone, being tearful, having difficulty sleeping, and "some wetting herself." R.D. told Kleinpeter that, at her "grandmother's" house, "Tío Tommy" had put his finger in her "cookie" and that it hurt. R.D. also said that appellant told her not to tell. When R.D. gave this information in the first therapy session, she was tearful and sobbing. When asked what concerns R.D. had raised during the sessions, Kleinpeter replied that R.D. was afraid that appellant would "come and steal her." R.D. had asked several times if appellant was in jail.

When asked if she had an opinion as to whether it would be harmful to R.D. to testify in appellant's presence, Kleinpeter replied, "I believe it would be harmful." When asked why, Kleinpeter responded that, after two months of therapy, R.D.'s functioning returned to normal, but within the last six weeks, R.D. had become aware that something was happening with respect to

appellant and the courts, and R.D. had become clingy and anxious, and had started bedwetting again. The last time Kleinpeter saw R.D., R.D. was tearful and asked whether appellant was still in jail.

Because her abuse had occurred at such a young age, Kleinpeter believed that the abuse could be "nearly forgotten." "It can be a *non sequitur* in her childhood. " R.D. had "basically resolved the issues" and was doing well. But if R.D. were placed in a situation where adults were highlighting the abuse, and R.D. was reliving it, it would "become more of a defining moment of her childhood." "If we bring her in front of many adults—certainly in front of her uncle—" Kleinpeter stated, "I believe it will have tremendous impact on her functioning in the future." When asked whether the harm would be minimal or significant, Kleinpeter responded, "I think it would be significant." Kleinpeter also affirmed that testifying about the abuse would be almost as damaging as the abuse itself.

Kleinpeter further testified that R.D. was "very bright" and "very verbal," but she would be testifying from the memory of a three-year-old. Kleinpeter was then presented with the three options of (1) courtroom testimony, (2) testimony by closed-circuit television without the defendant present, or (3) the procedure under § 2 in which written questions could be submitted to an interviewer like Johnson for her to ask the child in The Bridge setting. When asked which of these options "would be the most likely to get a response" from the child, Kleinpeter responded, "The third option." Kleinpeter further responded that the best procedure would be one in which the child was "interviewed by a woman, alone." Kleinpeter also testified that this procedure would be the least likely to psychologically harm R.D.

Kleinpeter concluded her direct examination testimony by explaining that R.D. was "a bright, sensitive little girl who experienced extreme trauma, fear, physical assault, [and] emotional assault."

Her security was destroyed for a time, but she had regained it, although there was "still some fragility." If the abuse were "highlighted" again—if R.D. were placed in a situation "where she has to remember, relive, and deal with the people concerning that"—then "it will damage her significantly."

On cross-examination, defense counsel asked if the child were placed in a separate room from the courtroom and the testimony were relayed by closed-circuit television, "There's no reason that the child couldn't do that, is there?" Kleinpeter responded, "I think it'd make her very anxious. I don't think she would respond. I think it'd be frightening for her." In response to further questioning, Kleinpeter acknowledged that it would "help somewhat" if R.D. could not see appellant and an adult R.D. knew was in the room with her.

On re-direct examination, Kleinpeter stated that testifying by closed-circuit television would be harmful to R.D. and that harm would be significant. Kleinpeter also stated that even an interview in The Bridge setting, by causing the child to remember again "something that needs to be put to rest," runs the risk of making the abuse "the defining incident in her childhood and having a significant impact when she's 11 or 12." So even an interview at The Bridge would be hard for the child and somewhat damaging, but the child would be able to respond to questioning.

After both parties finished questioning Kleinpeter, the trial court asked about the child's ability to respond in the closed-circuit-television situation. Kleinpeter responded, "I think there's probably an eighty percent chance that she would not open her mouth."

### B. Defense Counsel's Decision

After the trial judge ruled that the interrogatories procedure would be used, the parties stated that they were prepared to proceed that afternoon. Defense counsel had conferred with forensic

interviewer Brandi Johnson and had prepared a revised list of questions that he found satisfactory. The trial court then asked if defense counsel was comfortable with Johnson trying "to follow up on certain questions if it were appropriate." Defense counsel stated that he had no objections to her doing that and that he would want her to clarify an answer that was not clear. Defense counsel also stated that Johnson had agreed to "talk to the child about truthfulness and understanding" before asking any of his questions. So, Johnson had defense counsel's "permission to adjust her questions as the situation may call for."

But the prosecutor was concerned about allowing Johnson to ask her own follow-up questions. His concern was that Johnson might ask a question that defense counsel later found to be objectionable, that would create a legal issue in court later on. Defense counsel then responded that, if the trial court permitted it, he could be present in an adjacent room to write follow-up questions:

> I am fairly familiar with this Bridge video process. I've seen a number of them, and I'm aware that they have at least law enforcement officials or CPS officials in an adjacent room. And often, you will see the interviewer in these videos tell the child, I'll be right back, and they go see these other people to see if there's any other questions they needed to ask the child.

> And then they – it didn't show that on this video, but they'll come back in the room and ask the child a few more questions.

> It is not their normal policy at The Bridge, I'm informed, to let a defense attorney be in an adjacent room, but I think in fairness to Mr. Coronado, I would like to go to The Bridge – the interview is at 2:00 p.m. today – and be in an adjacent room. And in the event something did come up that I felt another question would be appropriate, I'd like to be there.

> Now – and I assume perhaps someone from the district attorney's office might want to be there, also. But I think the judge would have to order The Bridge to allow me to be there. I don't think their policy would allow me otherwise.

The prosecutor responded that defense counsel's presence in an adjacent room is against The

Bridge's policy, and there would need to be a written order from the court to allow that.

The trial court responded:

> Well, we do it one way or the other. I mean, we either let her have leeway to follow up on the questions, which [defense counsel] said he was agreeable to, to begin with, or we let [defense counsel] be there where he can write out follow-up questions and send in there.

The trial court then stated that he thought it best to give Johnson, an experienced interviewer, the

ability to ask follow-up questions. At that point, the prosecutor and defense counsel both stated that

they were agreeable to the trial court's suggestion. Specifically, defense counsel stated: "I don't have

a problem with Mrs. Johnson using her professional judgment in questioning a five-year-old child.

She's better at it than I am, I'm sure." For purposes of the record, however, the defense continued

to object to the trial court's decision "about testimony by interrogatories only."

## II. ANALYSIS

### A. *Maryland v. Craig* and *Crawford v. Washington*

The Sixth Amendment to the United States Constitution confers upon an accused the right

"to be confronted with the witnesses against him."[1] This "Confrontation Clause" reflects "a strong

preference for face to face confrontation at trial."[2] Face-to-face confrontation is not an

"indispensable" element of the Sixth Amendment guarantee, but it may not "easily be dispensed

with."[3] A denial of face-to-face confrontation is permissible only when necessary to further an

---

[1] U.S. CONST. amend. 6.

[2] *Romero v. State*, 173 S.W.3d 502, 505 (Tex. Crim. App. 2005).

[3] *Maryland v. Craig*, 497 U.S. 836, 849-50 (1990).

important public interest and only when the reliability of the testimony is otherwise assured.[4]

In *Maryland v. Craig*, the United States Supreme Court held that a child could testify outside the defendant's presence by one-way, closed-circuit television if there is a "case-specific finding of necessity."[5] The Supreme Court suggested that necessity would be shown if facing the defendant in court would cause the child to suffer emotional trauma[6] or to suffer such serious emotional distress that the child could not reasonably communicate.[7] The Court recognized that the states have an interest in protecting the psychological well-being of child abuse victims.[8] In *Maryland v. Craig*, reliability of the testimony was assured by the closed-circuit television procedure because, though it deprived the defendant of the right to have the witness testify in his physical presence, it preserved three other elements of the confrontation right: oath, cross-examination, and observation of the witness's demeanor by the trier of fact.[9] The preservation of these three aspects of the confrontation right "adequately ensures that the testimony is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony."[10] Such a procedure is a "a far cry from the undisputed prohibition of the Confrontation Clause: trial by *ex*

---

[4] *Id.* at 850; *Romero*, 173 S.W.3d at 505.

[5] 497 U.S. at 860.

[6] *Id.* at 852-55.

[7] *Id.* at 860.

[8] *Id.* at 852-55.

[9] *Id.* at 851; *Romero*, 173 S.W.3d at 505.

[10] *Craig*, 497 U.S. at 851.

*parte* affidavit or inquisition."[11]

In *Romero v. State*, we held that when a procedure overrides "not just one but *two* elements of a defendant's right to confrontation," the circumstances used to justify the procedure must "rise above the 'important' interests referred to in *Craig* to interests that are truly compelling."[12] At issue in *Romero* was an adult witness who wore dark sunglasses, a baseball cap pulled down over his forehead, and a long-sleeved jacket with its collar turned up and fastened so as to obscure his mouth, jaw, and the lower half of his nose—the net effect and apparent purpose of which was to hide almost all of his face from view.[13] We found that this disguise had the effect of depriving the defendant of two aspects of confrontation: physical presence (due to anonymity the witness believed was conferred by the disguise) and the ability of the trier of fact to observe the witness's demeanor.[14] Further, we were unimpressed with the possibility that the witness would suffer psychological harm from testifying without a disguise because he was an adult and was not the victim of the offense.[15] "Calming an *adult* witness's fears," we explained, "is quite a different thing from protecting a child victim from serious emotional trauma."[16]

Although the Supreme Court has significantly changed Confrontation Clause jurisprudence

---

[11]  *Id.*

[12]  *Romero*, 173 S.W.3d at 506.

[13]  *Id.* at 503.

[14]  *Id.* at 505-06.

[15]  *Id.* at 506.

[16]  *Id.* (emphasis in original).

with a line of cases beginning with *Crawford v. Washington*,[17] none of the cases address the situation

confronted in *Craig*, as they all involved adult declarants and the lack of opportunity for the defense

to propound questions to the declarants.[18]   *Craig* has never been overruled, and we are still bound

to follow it.[19] Nor are the cases necessarily inconsistent: "*Crawford* addresses the question of *when*

confrontation is required; *Craig* addresses the question of *what* procedures confrontation requires."[20]

In *Crawford*, the Court held that the admission of "testimonial" statements satisfies the Sixth

Amendment only upon a showing of "unavailability and a prior opportunity for cross-examination."[21]

---

[17]   541 U.S. 36 (2004).

[18]   *See Crawford*, 541 U.S. at 40 (admission of tape-recorded statement to police made by defendant's wife, who did not testify due to marital privilege); *Davis v. Washington*, 547 U.S. 813, 818-19 (2006) (admission of tape-recorded 911 call from defendant's ex-girlfriend, who did not testify); *Giles v. California*, 554 U.S. 353, 356-57 (2008) (admission of a statements made in connection with a domestic violence report by defendant's ex-girlfriend three weeks before her death); *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527, 2530-31 (2009) (admission of sworn laboratory reports of chemical analysis where chemists who performed the analyses did not testify); *Michigan v. Bryant*, 131 S. Ct. 1143, 1150 (2011) (admission of statements made by mortally wounded man to police officers).

[19]   *See Horn v. Quarterman*, 508 F.3d 306, 319 (5th Cir. 2007) ("[W]e are not at liberty to presume that *Craig* has been overruled *sub silentio*."); *United States v. Pack*, 65 M.J. 381, 385 CAAF 2007) (Supreme Court has not overruled *Craig* and "the weight of authority" holds "that *Craig* continues to control the questions whether, when, and how, remote testimony by a child witness in a criminal trial is constitutional."); *State v. Stock*, 361 Mont. 1, 7-8 (2011) ("*Crawford* did not overrule or even address *Craig*."); *State v. Henriod*,131 P.3d 232, 237 (Utah 2006) ("We disagree with the conclusion of the district court that *Crawford* abrogated *Craig*. The *Crawford* majority opinion not only failed to explicitly overrule *Craig*, but also failed to even mention it.").

[20]   Andrew W. Eichner, *Preserving Innocence: Protecting Child Victims in the Post-Crawford Legal System*, 38 AM. J. CRIM. LAW 101, 115 (Fall 2010) (quoting Richard D. Friedman, *The Confrontation Clause Re-Rooted and Transformed*, 2004 CATO SUP. CT. REV. 439, 454 (2004) ("In truth, "[t]he two cases an coexist peacefully" because they address two different elements of the Confrontation Clause . . . .")).

[21]   541 U.S. at 68.

*Craig* appears to provide the appropriate framework for determining whether those two showings have been made: (1) whether the child has been rendered unavailable due to the trauma traditional proceedings would cause, and (2) whether the alternate procedure in place is an adequate method of cross-examination.

### B. Unavailability

In the present case, the evidence overwhelmingly showed that the child was unavailable due to the threat posed to her emotional well-being by traditional proceedings. The present and future emotional well-being of a five-year-old was at stake. The trial court heard expert testimony that this very young child would be likely to suffer significant psychological harm if made to testify in front of multiple adults, whether in the courtroom or by way of closed-circuit television. There was evidence that, given R.D.'s young age at the time of the sexual assaults and her progress in therapy, she could live a normal life and put the incidents almost entirely behind her. But making her recount and relive the events in front of multiple adults could destroy this chance at a normal life and transform the sexual assaults into a defining moment of her childhood. While the evidence indicated that there was a risk of that harm occurring with any sort of questioning about the sexual assaults, the evidence also indicated that the risk of harm would be minimized best by a procedure that involved R.D. answering questions alone with an experienced, female interviewer. And the trial court had evidence that R.D. probably would not be able to talk if placed in the closed-circuit-television setting.

Importantly, the evidence of harm was very specific in this case. The State did not simply present evidence that the child would suffer harm if she testified in the courtroom; it presented evidence that she would suffer significant harm even if she testified by closed-circuit television.

Further, the State presented evidence that the interrogatories procedure would best minimize any harm to the child and was the only method that was likely elicit meaningful responses.

### C. Cross-Examination

The next question is whether the interrogatories procedure offered an adequate opportunity for cross-examination. Because the Supreme Court upheld the closed-circuit-television procedure that took place in *Craig*, I find it helpful to compare that procedure to the procedure that took place in the present case.[22] There are six ways in which the procedure conducted under § 2 could deviate from the procedure approved in *Craig*. First, the § 2 procedure is not live. Second, defense counsel observes the witness's demeanor only on a video screen. Third, defense counsel is not allowed to personally propound his cross-examination questions. Fourth, a lapse of time occurs between the interviewer's original questions and defense counsel's cross-examination questions. Fifth, an oath or affirmation might not be administered. And sixth, defense counsel might not have the opportunity to ask follow-up questions. But were these deviations present here, and to what extent were they important?

### 1. *Not Live*

With a closed-circuit-television procedure, testimony is live—the finder of fact observes the testimony as it occurs. Under § 2, the testimony is not live. Live testimony affords the defense an

---

[22] The Supreme Court of Washington has stated that a court "must consider the use of close-circuit television" before finding the child victim "unavailable for the purpose of admitting his or her hearsay statements." *State v. Smith*, 148 Wn.2d 122, 139, 59 P.3d 74, 82 (2002). This suggests that the availability of a closed-circuit-television procedure could be a baseline for determining whether other procedures are constitutionally adequate. The Supreme Court, however, has declined to require an exploration of "less restrictive alternatives" or to establish "any . . . categorical evidentiary prerequisites for the use of the one-way television procedure," *Craig*, 497 U.S. at 859-60.

opportunity to conduct cross-examination in light of the jury's reaction to questioning or in light of other events that have occurred at trial.[23] If the testimony is pre-recorded, then this opportunity is lost. Nevertheless, there are two significant ways in which both of these situations differ from a regular trial: (1) the witness does not see the defendant and the finder of fact, and (2) the defendant and the finder of fact observe the witness only on a video screen.

The opportunity to adjust to events at trial is an aspect of the right of confrontation, but a reading of *Craig* suggests that the Supreme Court does not view it as particularly significant in the context of a sexually abused child. In arriving at its holding in *Craig*, the Supreme Court noted that thirty-seven states—including Texas—"permit the use of videotaped testimony of sexually abused children."[24] The Supreme Court referred to § 4, not § 2, of article 38.071, but the implication is that pre-recording does not by itself create a confrontation problem.

Relying upon *Craig*'s reference to the videotape statutes, the Second Circuit held that "*Craig* did not rest on the distinction between contemporaneous and videotaped testimony."[25] In doing so, the court expressly rejected an argument that the pre-recorded nature of the testimony violated the right of confrontation by preventing defense counsel from gauging the reaction of the jury or tailoring cross-examination in light of events transpiring at trial.[26] Several other courts have held

---

[23] *See Spigarolo v. Meachum*, 934 F.2d 19, 24 (2[d] Cir. 1991) (Because testimony was pre-recorded, the defendant contended that "his counsel was unable to gauge the reaction of the jury during cross-examination, nor able to tailor his cross-examination based upon the course of events which transpired at trial.")

[24] 497 U.S. at 853 & n.2 (listing state statutes, including article 38.071, § 4).

[25] *Spigarolo*, 934 F.2d at 24-25.

[26] *Id.*

that there is no material difference under *Craig* between pre-recorded video and live televised testimony.[27]

Had the closed-circuit-television procedure been employed in this case, appellant would have been able to view the jurors' reactions to the child-witness's testimony, and he might have been able to communicate such reactions to defense counsel. The likelihood that defense counsel's cross-examination would have been influenced as a result seems slight, but the inability to gauge the jurors' reactions prior to cross-examination is a factor to consider, though the Supreme Court does not appear to weigh it heavily.

### 2. *Demeanor Only on Video*

With the closed-circuit-television procedure, defense counsel may observe the witness's demeanor first-hand, but under the § 2 procedure, defense counsel can see the witness's demeanor only on video.[28] Although this is a difference between the two procedures, it does not seem significant. The closed-circuit-television procedure necessarily deprives the jury and the defendant

---

[27] *Thomas v. Gunter*, 962 F.2d 1477, 1481 n.5 (10th Cir. 1992) (citing *Spigarolo*); *Thomas v. State*, 803 P.2d 144, 151 (Colo. 1990) ("Although a videotaped deposition is pre-recorded, the relevant safeguard recognized in *Craig* is not the fact that the testimony is live, but the fact that the jury can view the child's demeanor during questioning."); *State v. Self*, 56 Ohio St. 3d 73, 78, 564 N.E.2d 446, 451-52 (1990) (finding no significant difference in the videotaped-deposition-procedure in the Ohio statute and the closed-circuit-television procedure approved in *Craig*); *State v. Naucke*, 829 S.W.2d 445, 451-54 (Mo. 1992) (concluding, after extensive discussion, that there was no significant difference between live televised testimony and pre-recorded testimony for confrontation purposes, remarking that a contrary holding "would be straining at a gnat," and citing *Spigarolo* and footnote 2 of *Craig*). The Supreme Court of Missouri found pre-recorded testimony to be superior to live testimony in one respect: defense counsel had the luxury of a more deliberate viewing of the testimony and consultation with his client prior to conducting cross-examination, which could increase its effectiveness. *Naucke*, 829 S.W.2d at 453.

[28] For the *second* interview, it might be possible for defense counsel to observe the witness through a one-way mirror.

of a first-hand view of the witness, but the Supreme Court found that a video presented an adequate opportunity to view the witness's demeanor.[29]  If a video is an adequate vehicle for depicting demeanor to the defendant and to the jury, it can hardly be considered inadequate for defense counsel.

### 3. *Cannot Personally Propound Questions*

With the closed-circuit-television procedure, defense counsel personally propounds questions to the witness, but in the § 2 procedure, those questions, though written by defense counsel, are propounded by a neutral interviewer.  The Supreme Court of Colorado has held that a defendant's confrontation rights were not violated by videotaped questioning conducted by therapists employed by the State and the defense when the defendant consented to therapist questioning, though he did not consent to the videotaped procedure itself.[30]  The court declined to address whether "therapist questioning over the defendant's objection would fatally impair the sufficiency of the guarantee of reliability of videotaped deposition testimony."[31]

When a criminal trial is conducted properly, and defense counsel properly fulfills his role, the trial is "a confrontation between adversaries."[32]  In *Craig*, the Supreme Court explained that the closed-circuit-television procedure "ensures the reliability of the evidence by subjecting it to rigorous

---

[29]  *Craig*, 497 U.S. at 851 ("the judge, jury, and defendant are able to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies").

[30]  *Thomas*, 803 P.2d at 151.

[31]  *Id.* at 151 n.16.

[32]  *United States v. Cronic*, 466 U.S. 648, 657 (1984).

adversarial testing and thereby preserves the essence of effective confrontation."[33]  I agree with appellant and the Court that confrontation is supposed to be adversarial, which ordinarily includes the defendant's designated advocate being permitted to personally conduct cross-examination.

But the right to have one's advocate personally ask questions is not absolute.  I am unaware of any Confrontation Clause case involving the use of written interrogatories dictated by defense counsel, but there are cases permitting the trial court to direct a third party to propound questions dictated by a defendant when the defendant has asserted his right to self-representation and wishes to personally cross-examine the victim.[34]  Here, defense counsel was at least able to dictate each question he wished to ask.

### 4. *Lapse of Time*

The closed-circuit-television procedure approved in *Craig* permitted defense counsel to engage in "contemporaneous" cross-examination.[35]  The Supreme Court has elsewhere suggested that the absence of contemporaneous cross-examination has a bearing on the reliability of hearsay

---

[33]  497 U.S. at 857.

[34]  *See Partin v. Commonwealth*, 168 S.W.3d 23, 27-29 (Ky. 2005) (discussing cases); *Fields v. Murray*, 49 F.3d 1024, 1027-28, 1034-37 (4th Cir. 1995) (discussing *Craig*); *State v. Taylor*, 562 A.2d 445, 454 (R.I. 1989). *Cf. Commonwealth v. Conefrey*, 570 N.E.2d 1384, 1390-91 (Mass. 1991) ("The mere belief held by the judge that the complainant could be intimidated or harmed beyond the normal limits associated with a trial involving a young complainant . . . is not sufficient to justify the restriction placed on cross-examination." But if it were "formally established . . . that the defendant would or could not conduct a proper examination without interfering with the rights of the complainant or distorting the truth-seeking function of the trial, the judge might have been correct in limiting the form of the defendant's cross-examination."). *See also M.L.L. v. Wessman*, 532 N.W.2d 653, 660-62 (N.D. 1995) (discussing *Fields* and other criminal cases involving a defendant's right to self-representation in holding, in termination of parental rights proceeding, that defendant need not be given opportunity to personally cross-examine witnesses).

[35]  497 U.S. at 851.

testimony for Confrontation Clause purposes.[36]  But in *California v. Green*, the Court held that contemporaneity of cross-examination was not essential.[37]  The Court explained that "the inability to cross-examine the witness at the time he made his prior statement cannot easily be shown to be of crucial significance as long as the defendant is assured of full and effective cross-examination at the time of trial."[38]  In *Crawford v. Washington*, the Supreme Court cited *Green* for the proposition that, "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." [39] Addressing a former version of § 2 in *Briggs v. State*, we cited *Green* for the proposition that the Confrontation Clause was satisfied by providing a defendant with the opportunity for full and effective cross-examination at trial.[40]

It is true that defense counsel's questions in the present case were not delivered at trial, and

---

[36]  *See Lilly v. Virginia*, 527 U.S. 116, 139 (1999) (Absence of contemporaneous cross-examination was a factor militating against finding that co-conspirator's statements "were so inherently reliable that cross-examination would have been superfluous.").

[37]  399 U.S. 149 (1970).

[38]  *Id.* at 159.

[39]  541 U.S. 36, 59 n.9 (2004).

[40]  *Briggs v. State*, 789 S.W.2d 918, 922 (Tex. Crim. App. 1990).  The version of § 2 at issue in *Briggs* required the child witness to be available to testify at trial.  *See* Tex. Code Crim. Proc. art. 38.071, §2(a)(8), (b) (West 1986).  We held that the statute might function to deprive the accused of due process if the State merely made the child "available" and forced the defendant to call the child to the witness stand.  *Id.*  Our due-process concern was based upon the "stigma" the defendant would endure by forcing the child to testify.  *Id.*  Under the current version of § 2, which substituted the interrogatories procedure for calling the child as a witness at trial, the defendant will never be put in the position of calling the child to the witness stand, so we perceive no stigma associated with the current procedure.  The current procedure also addresses our observation that the prior version of the statute was "self defeating."  *See id.* at 922 n.4 ("If the purpose of former Article 38.071, *supra* was to insulate child victims entirely from the necessity of testifying in open court, it would seem to be self defeating.").

the effectiveness of the cross-examination by written interrogatories is in question in this case.

Nevertheless the Supreme Court's reasoning undercuts the notion that cross-examination must occur

contemporaneously to be effective:

> It may be true that a jury would be in a better position to evaluate the truth of the prior statement if it could somehow be whisked magically back in time to witness a grueling cross-examination of the declarant as he first gives his statement. But the question as we see it must be not whether one can somehow imagine the jury in "a better position," but whether subsequent cross-examination at the defendant's trial will still afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement. On that issue, neither evidence nor reason convinces us that contemporaneous cross-examination before the ultimate trier of fact is so much more effective than subsequent examination that it must be made the touchstone of the Confrontation Clause.[41]

If the written interrogatories procedure is otherwise an adequate substitute for traditional, in-court

cross-examination, the lapse of time between the original interview and delivery of the

interrogatories would not appear to be sufficient to invalidate the procedure.[42]

### 5. *Oath*

---

[41] *Green*, 399 U.S. at 160-61.

[42] The Supreme Court also stated that the "main danger in substituting subsequent for timely cross-examination seems to lie in the possibility that the witness' 'false testimony is apt to harden and become unyielding to the blows of truth in proportion as the witness has opportunity for reconsideration and influence by the suggestions of others, whose interest may be, and often is, to maintain falsehood rather than truth." *Id.* at 159. This danger "disappears when the witness has changed his testimony so that, far from 'hardening,' his prior statement has softened to the point where he now repudiates it." *Id.* Although cited as the "main danger" of belated cross-examination, the Court did not say that this danger was substantial enough that it would permit belated cross-examination only for inconsistent statements, and in fact, the Court has since stated that the witness's availability for cross-examination would always obviate a Confrontation Clause problem. *Crawford*, 541 U.S. at 59 n.9; *see also Green*, 399 U.S. at 162 ("For when a declarant is not absent, but is present to testify and to submit to cross-examination, our cases, if anything, support the conclusion that the admission of his out-of-court statements does not create a confrontation problem.").

The § 2 procedure does not require an oath,[43] but an "oath" was one of the aspects of the closed-circuit-television procedure in *Craig* that the Supreme Court found made the procedure acceptable under the Confrontation Clause.[44] In Texas, a witness must declare that he will testify truthfully "by oath or affirmation administered in a form calculated to awaken the witness' conscience and impress the witness' mind with the duty to do so."[45] Our rule is modeled after the federal rule, which was "designed to afford the flexibility required in dealing with religious adults, atheists, conscientious objectors, mental defectives, and children."[46]

After reviewing the first video I conclude that an oath was not obtained from the child in the first interview. Although Johnson diligently questioned R.D. on her ability to distinguish between the truth and a lie, and Johnson admonished the child of the importance of telling the truth, R.D. never said that she would tell the truth. In fact, Johnson conceded that the video shows that R.D. answered negatively when Johnson attempted to secure a promise to tell the truth. Nevertheless, the

---

[43] *See* TEX. CODE CRIM. PROC. art. 38.071, § 2.

[44] 497 U.S. at 851.

[45] TEX. R. EVID. 603. *See also* FED. R. EVID. 603; *Craig*, 497 U.S. at 845 (describing the purpose of an oath as "impressing [the witness] with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury.").
    The Second Circuit and the State of Colorado have addressed the oath requirement in the Confrontation Clause context. The Second Circuit held that "[w]hen children testify, the trial court may fashion an oath or affirmation that is meaningful to the witness." *Spigarolo*, 934 F.2d at 24. It further held that an affirmation "is simply a solemn undertaking to tell the truth; no special verbal formula is required." *Id.* The Supreme Court of Colorado found that the purpose of the oath was satisfied when the children were asked at the start of each videotaped deposition to explain the difference between the truth and a lie and were told at critical times that it was very important that they tell the truth. *Thomas*, 803 P.2d at 151. I disagree with the Colorado court's formulation of the oath to the extent that it does not require that the child give some assurance that he or she will actually tell the truth.

[46] FED. R. EVID. 603 advisory committee's note.

second video shows that the oath requirement was satisfied for the second interview. Johnson again questioned R.D. on her ability to distinguish between the truth and a lie, and again emphasized the importance of telling the truth, but this time, she also secured a promise from R.D. to tell the truth.[47]

What is crucial to the confrontation issue is that the oath requirement was satisfied during the second video. It is the second video that served as appellant's opportunity for cross-examination. In *Green*, the Supreme Court suggested that, so long as the cross-examination contains adequate protections, a prior hearsay statement without those protections can be admitted without violating the Confrontation Clause: "It is of course true that the out-of-court statement may have been made under circumstances conferring none of these protections [oath, cross-examination, jury's observation of demeanor]. But if the declarant is present and testifying at trial, the out-of-court statement for all practical purposes regains most of the lost protections."[48]

### 6. *Follow-up Questions*

There is no doubt that an essential part of being able to confront the State's witnesses is having an opportunity to ask follow-up questions. The § 2 procedure does not guarantee that defense counsel will have that opportunity,[49] and that lack is of great concern. But nothing prevents a trial judge from affording the defense such an opportunity, and the judge in the present case appeared to be prepared to do just that. Defense counsel, however, was content to delegate his right to ask

---

[47] R.D. did not correctly answer all of the questions designed to determine her ability to distinguish between the truth and a lie, but the record was sufficient, from the videos and from the pretrial hearing, for the trial court to conclude that R.D. sufficiently understood the concept of truthfulness to give an oath and was competent to testify. *See also* TEX. R. EVID. 601(a)(2).

[48] 399 U.S. at 158.

[49] *See* TEX. CODE CRIM. PROC. art. 38.071, § 2.

follow-up questions to Johnson, the neutral interviewer. In his brief, appellant characterizes as a "throwaway" statement defense counsel's comment that Johnson was better at questioning a child. But it was not a throwaway statement; it was made in the context of defense counsel agreeing that Johnson would be permitted to ask any necessary follow-up questions rather than having defense counsel present at The Bridge to observe the interview and compose follow-up questions himself.

Had defense counsel insisted on wanting to be present at The Bridge to observe the child (by video or perhaps through a one-way mirror) so that he could compose follow-up questions, and had the trial court denied such a request, this would be a different case. But defense counsel expressed satisfaction with Johnson being allowed to follow-up where necessary, and he did not later complain that there were follow-up questions that needed to be asked. Under these circumstances, defense counsel was not denied the opportunity to ask follow-up questions in this case.

### 7. *Adequate Cross-Examination?*

Defense counsel was allowed to formulate his own questions, and he delegated to the interviewer the right to ask follow-up questions. The questions were answered under oath. The interrogatory session was not live and occurred a year after the child's first statement, but both of those facts could be true in pre-recorded videotaped procedures that *Craig* referred to with approval. And the judge, the jury, and the parties were able to view the demeanor of the child while she answered questions. The only difference of significance seems to be counsel's inability to propound his questions personally. Although the right of a defendant's chosen advocate to personally propound questions is an aspect of confrontation, the self-representation cases show that such a right is not absolute and can be curtailed if it would cause significant harm to the witness.

The Court contends that many post-*Crawford* child-abuse videotape cases that have been

reversed involved procedures that allowed the admission of testimonial statements "without any cross-examination or an insufficient opportunity for cross-examination." The question in the present case is the sufficiency of the chosen method of affording cross-examination. Most of the cases cited by the Court involved no opportunity to question the declarant, and so are not relevant to the issue before us. Only three cases cited by the Court involved methods of allowing defense questioning that were deemed insufficient, and all three are readily distinguishable from the present case.[50] In those three cases, the questioning occurred at either a discovery deposition or a preliminary hearing.[51] Defense questioning of a declarant in a discovery deposition or a preliminary hearing may fall short of adequate cross-examination for one or more of three reasons: (1) the scope of questioning is limited, (2) the admissibility of the responses is limited, or (3) defense counsel does not have the same or a similar motive for developing the testimony at such a hearing as he would at trial.[52] By contrast, in the interrogatories procedure at issue in the present case, the scope of questioning was

---

[50] *See State v. Contreras*, 979 So. 2d 896 (Fla. 2008); *State v. Blue*, 717 N.W.2d 558 (N.D. 2006); *People v. Fry*, 92 P.3d 970 (Colo. 2004).

[51] *Contreras*, 979 So. 2d at 908-11 (discovery deposition); *Blue*, 717 N.W.2d at 565-66 (preliminary hearing); *Fry*, 92 P.3d at 976-78 (preliminary hearing).

[52] *See Contreras*, 979 So. 2d at 911 (discovery deposition answers admissible only as impeachment and not as substantive evidence); *id.* at 910-11 (contrasting with deposition to perpetuate testimony and explaining that "the purpose of a discovery deposition is at odds with the concept of meaningful cross-examination" because the defendant "cannot be expected to conduct an adequate cross-examination as to matters of which he first gained knowledge at the taking of the deposition"and "especially if the defendant is unaware that this deposition would be the only opportunity he would have to examine and challenge the accuracy of the deponent's statements."). *Blue*, 717 N.W.2d at 566 (discussing "same or similar motive" requirement in the context of a hearing designed to ascertain a child witness's reliability); *Fry*, 92 P.3d at 977 (cross-examination in preliminary hearing restricted to subject of probable cause). The "same or similar" motive requirement is a traditional component of the "former testimony" exception to the hearsay rule. *See* TEX. R. EVID. 804(b)(1).

the same as would be permitted at trial, the child declarant's answers were fully admissible at trial, and defense counsel had the exact same motive to develop the testimony as he would have at trial.

This is a close case, involving a procedure that should rarely be used, but I would hold that the Confrontation Clause was complied with here. I respectfully dissent.

Delivered: September 14, 2011
Publish